# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

TAMMY MARIE HAAS and CONRAD
SZCZPANIAK, individually and
on behalf of a class of
similarly situated
individuals,                        Civil No. 08-1102 (NLH/JS)

        Plaintiffs,          **OPINION**

   v.

BURLINGTON COUNTY, et al.,

        Defendants.

---

<u>**APPEARANCES**</u>:

CARL D. POPLAR
CARL D. POPLAR, P.A.
1010 KINGS HIGHWAY SOUTH
BUILDING ONE
CHERRY HILL, NJ 08034

WILLIAM A. RIBACK
WILLIAM RIBACK, LLC
132 HADDON AVENUE
HADDONFIELD, NJ 08033

DAVID J. NOVACK
BUDD LARNER, PC
150 JOHN F. KENNEDY PARKWAY
CN1000
SHORT HILLS, NJ 07078-0999

    *Attorneys for Plaintiffs Tammy Marie Haas and Conrad*
*Szczpaniak, individually and on behalf of a class of similarly*
*situated individuals.*

EVAN H.C. CROOK
CAPEHART & SCATCHARD, P.A.
142 WEST STATE STREET
TRENTON, NJ 08608

*Attorneys for Defendants Burlington County, Burlington County Correctional Facility, and Ronald Cox.*

**HILLMAN**, District Judge

This case concerns a class action for constitutional and statutory harms suffered as a result of strip searches conducted at the Burlington County Correctional Facility ("BCCF"). Presently before the Court are four motions: (1) a Motion for Final Approval of the Class Action Settlement ("Motion for Final Settlement Approval"), (2) a Motion for Incentive Award on Behalf of Class Representative Tammy Marie Haas ("Motion for Haas Incentive Award Approval"), (3) a Motion for Attorneys' Fees and Expenses for Class Counsel Poplar and Riback ("Motion for Poplar and Riback Fee Approval"), (4) a Motion for Attorneys' Fees and Expenses for Class Counsel Lask, Goldman, and Novack ("Motion for Lask, Goldman, and Novack Fee Approval"). For the reasons explained herein, this Court will grant the Motion for Final Settlement Approval, grant the Motion for Haas Incentive Award Approval, and refer all counsel's attorneys' fees (and expenses) requests for further mediation before the assigned Magistrate Judge.

**BAKCGROUND**

Plaintiffs claim BCCF and Burlington County had an unconstitutional and illegal policy of strip-searching all

individuals entering their facilities without first establishing reasonable suspicion. Specifically, Plaintiffs Haas and Szczpaniak brought claims on behalf of individuals being detained on non-indictable offenses who were subject to this alleged policy. The claims were brought under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act ("NJCRA"). Plaintiff Haas filed her class action complaint in this Court in February 2008. Plaintiff Szczpaniak filed his class action complaint in the Superior Court of New Jersey, Burlington County in December 2009. Plaintiff Szczpaniak's complaint was removed to this Court shortly thereafter.

On November 24, 2009, both of these class action complaints were stayed pending the outcome of <u>Florence v. Burlington County</u>, which determined with finality a similar, but different, federal claim (but no state claim under the NJCRA). The stay was lifted in March 2011. By September 2012, Plaintiff Szczpaniak's class action complaint was consolidated with Plaintiff Haas's case in this Court. Discovery ensued thereafter, involving significant document production, an inspection of BCCF, and a number of depositions. Motions for summary judgment and class certification were filed and refiled between October 2013 and April 2014. Oral argument was held by this Court in January 2015 on these motions.

As a result, the Court instructed the parties to focus

briefing on the pending state law claims under the NJCRA. Oral argument was again held in March 2015. Decision was reserved, but the Court did request additional briefing on class definition for the class certification motion. Shortly thereafter, the Court ordered the parties to begin mediation before the able Magistrate Judge John Hughes (Ret.). Mediation occurred between June 2014 and February 2016, but was ultimately stalled because a dispute arose between Defendants and their insurance carrier concerning coverage.

The equally able Magistrate Judge presently assigned to the matter, the Hon. Joel Schneider, instructed the parties in March 2017 that settlement discussions would continue under his supervision. After resolving the dispute between Defendants and their insurance carrier, Judge Schneider was successful in bringing the parties together on settlement terms. A memorandum of understanding was drafted in June 2017, and a settlement agreement was executed on October 4, 2017.

That same day, Plaintiffs filed a motion to certify the class for preliminary approval. After extensive briefing, the Court held a hearing on this motion on January 31, 2018. During that hearing, this Court appointed Carl D. Poplar and David J. Novack as co-class counsel. The Court also appointed Strategic Claim Services ("SCS") to act as the class claims administrator. Finally, the Court certified the settlement class for purposes

of settlement, preliminarily approved the settlement, and
ordered notice to be sent to all putative class members.  A
formal Order was entered on April 20, 2018.  Notice was sent in
accordance with this Order and claims were received by SCS.  In
December 2018, the instant motions described <u>supra</u> were filed.
These motions are fully briefed and ripe for adjudication.  A
final fairness hearing was conducted on January 16, 2019 and
oral argument heard on the motions before the Court.

<u>**ANALYSIS**</u>

**A.    Settlement Agreement**

The settlement agreement under review in this case was
executed on October 4, 2017 (the "Settlement Agreement").  The
Court granted preliminary approval of the Settlement Agreement
and certified the settlement class on April 20, 2018.  Now,
considering notice to class members has been completed, it is
time for the Court to consider whether the terms of the
Settlement Agreement meet the standard under Federal Rule of
Civil Procedure 23(e).  Before engaging in the legal analysis
required, this Court lays out the terms of the settlement
agreement.

**a. <u>The Settlement Class</u>**

The members of the settlement class (the "Class" or "Class
Members") include:

All persons who were placed into the custody of the

5

Burlington County Correctional Facility as a result of non-indictable matters and were strip searched upon their entry into Burlington County Correctional Facility pursuant to the policy, custom and practice of the County of Burlington during the period of February 26, 2006 and extending until February 28, 2013.

## b. **The Settlement's Value**

Class Members are entitled to a share of the settlement's value. A settlement fund has been established in the amount of $1,475,000, paid into by both Burlington County and its insurer. Class Members are eligible to receive up to $400 per claim. If the Class Members exceed 3,487, the amount per claim will be reduced on a pro-rata basis. If the settlement fund is not entirely exhausted by claimants, the remaining funds will revert back to Defendants and their insurance carrier.

In addition to monetary relief, the Settlement Agreement also discloses that Burlington County has revised its strip search policies effective February 28, 2013. The new policies prohibit strip searches of all non-indictable pretrial detainees in the absence of reasonable suspicion. The officers who will be implementing this policy have been appropriately trained. The new policy, according to the parties, is in accord with statutory and constitutional obligations, state and federal.

## c. **Provision for Late Claims**

The Settlement Agreement – and this Court's Order – required all putative class members to submit their claims by

October 15, 2018.  Notice was sent in the manner described - and previously approved by the Court – _infra_.  In addition to the notice requirements set by the Court and at some point after October 15, 2018, SCS sent an email to putative class members – at the direction of Plaintiffs' counsel – informing them that the claims period had closed but that Plaintiffs' counsel would petition for the inclusion of any individuals who submitted late claims.

While the Court will examine the legal basis for accepting these claims _infra_, it notes here a specific provision of the Settlement Agreement pertaining to procedures for late claimants.  That provision, III.C.2., states:

> The Parties anticipate that late claims may be filed subsequent to the end of the Claims Period. Late claims may be allowed, if submitted on or before the date of the Final Approval Hearing.  All late claims will be subject to approval of the Court prior to being paid as part of the distribution of the Settlement.

As a result of the email sent by SCS after the claims period closed in this case, there were numerous claimants who filed late claims.

### d. Dismissal of Action and Release of Claims

In exchange for the above benefits, the settlement provides for the dismissal with prejudice of the claims asserted in this action, and that all Class Members will fully release Defendants from all federal and state law claims that could have been

asserted in this action, including those claims relating to the practice of unlawful strip searches during the class period. Any Class Members who opt-out of the settlement within the time period prescribed in the agreement will not receive an award and do not release any related claims they may possess.

**e. Attorneys' Fees, Incentive Awards, and Administrative Fee**

In addition to the $1,475,000, Defendants also agree to pay $900,000 in attorneys' fees and $25,000 in costs. The attorneys' fees, although paid into the general settlement fund, do not reduce funds available to the class members. Out of the $1,475,000 fund for class members, however, the Settlement Agreement directs that $80,000 will be paid to the class representatives as an incentive award. Plaintiff Haas is slated to receive $50,000 and Plaintiff Szczpaniak agreed to receive $30,000. In addition to the Settlement Agreement, the class representatives Haas and Szczpaniak signed a separate agreement reflecting that they would receive the above amounts in consideration for the release of all claims they may have against Defendants, among other things. (See ECF No. 350.)

In addition to the attorneys' fees and class incentive fees described supra, the parties have also agreed to pay, at most, $300,000 to the settlement administrator, SCS. This amount is intended to compensate SCS for the work it has done and will do

on behalf of the Class, including providing notice, maintaining and updating the website which is used to provide information to Class Members, receiving and processing claims, and fielding Class Member questions.

### f. **Class Notice**

After preliminary approval by this Court, notice was published in accordance with the Settlement Agreement. The Settlement Agreement required the settlement administrator, SCS, to mail notices approved by the Court to each putative class member and publish advertisements for the settlement in print, online through various websites, and via a news release. SCS also maintains a website to provide information about the settlement to Class Members. Putative class members, totaling almost 14,000 individuals, were given constitutionally adequate notice within the time prescribed in the Settlement Agreement. Additionally, as described supra, some Class Members also received an email from SCS which was sent after the class period had closed.

As of January 16, 2019, Plaintiffs have received 2,429 claims.[1] (See ECF No. 381.) Those claims can be broken down

---

[1] As noted, a number of these claims were filed after the original deadline. As of January 8, 2019, the parties believed that number was 431. (See ECF No. 375.) Considering the number of claimants shrank from 2,407 to 2,391 (because duplicates were found) between January 8, 2019 and January 16, 2019, the Court estimates that the total number of late claimants remains in

into the following categories:

- 1,778 claims from putative class members that all parties agree have a valid claim;

- 541 claims from putative class members that the parties dispute have a valid claim;

- 72 claims from putative class members who were unidentified by the parties, being neither on their list of agreed upon or disputed claimants;

- 3 putative class members who opted out of the settlement.

### g. **Objections**

One objection[2] was received by the parties and reviewed by

the Court.  The objection stated:

> While I agree that a strip search for a Child Support
> Warrant is a tad bit excessive, to know the initial
> client will received [sic] 1,000 times more than the
> rest *seriously lacks integrity.*
> For that alone I will not attach my name to this class
> action.

(emphasis in original).  The Court construed this as an

objection to the proposed incentive award of $50,000 for

---

approximately the same range.

[2] The Court understands that this may not technically meet the
definition of an objection because the individual may not be a
class member, has chosen not to opt-out, and has chosen not to
make a claim.  Even though this individual may not be considered
an objector under Rule 23(e)(5) and has not followed the
directions in the notice provided in terms of lodging his
objection, this Court – in its discretion and in an exercise of
caution – will treat this as an objection only for purposes of
evaluating this settlement under Rule 23(e).

Plaintiff Haas.  The Court notes here that Haas's incentive

award is 125, not 1,000, times larger than an individual class

claimant.[3]  This will be discussed <u>infra</u> where relevant.

**B.  Motion for Final Settlement Approval**

A class action, pursuant to Federal Rule of Civil Procedure

23(e), cannot be settled without the approval of the Court and a

determination that the proposed settlement is fair, reasonable,

and adequate.  <u>Halley v. Honeywell Int'l, Inc.</u>, 861 F.3d 481,

488 (3d Cir. 2017) (citing FED. R. CIV. P. 23(e) (providing that

"the claims . . . of a certified class may be settled . . . only

with the court's approval")).  The ultimate decision of whether

to approve a proposed settlement under this standard is left to

the sound discretion of the district court.  <u>Id.</u> (citation and

quotations omitted).

In assessing the fairness of a class action settlement, a

district court should consider several factors – called the

<u>Girsh</u> factors – including:

> (1) the complexity, expense, and likely duration of the
> litigation; (2) the reaction of the class to the
> settlement; (3) the stage of the proceedings and the amount
> of discovery completed; (4) the risks of establishing
> liability; (5) the risks of establishing damages; (6) the
> risks of maintaining the class action through the trial;
> (7) the ability of the defendants to withstand a greater
> judgment; (8) the range of reasonableness of the settlement
> fund in light of the best possible recovery; and (9) the
> range of reasonableness of the settlement fund to a

---

[3] Plaintiff Szczpaniak's incentive award, for the record, is 75
times larger.

possible recovery in light of all the attendant risks of litigation.

_Id._ at 861 F.3d at 489 (quoting <u>Girsh v. Jepson</u>, 521 F.2d 153, 157 (3d Cir. 1975) (quotations and alterations omitted)).[4]

Where "negotiations were conducted at 'arms' length by experienced counsel after adequate discovery, . . . there is a presumption that the results of the process adequately vindicate the interests of the absentees.'" <u>In re N.J. Tax Sales Certificates Antitrust Litig.</u>, --- F. App'x ---, 2018 U.S. App.

---

[4] The Third Circuit expanded the <u>Girsh</u> factors in 1998. <u>See</u> <u>In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions</u>, 148 F.3d 283, 323 (3d Cir. 1998) (explaining that "since <u>Girsh</u> was decided in 1975, there has been a sea-change in the nature of class actions, especially with respect to mass torts," and "it may be useful to expand the traditional <u>Girsh</u> factors to include, when appropriate," additional factors). These additional factors include:

> [10] the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages; [11] the existence and probable outcome of claims by other classes and subclasses; [12] the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants; [13] whether class or subclass members are accorded the right to opt out of the settlement; [14] whether any provisions for attorneys' fees are reasonable; and [15] whether the procedure for processing individual claims under the settlement is fair and reasonable.

<u>Prudential</u>, 148 F.3d at 323. The Court will address the relevant <u>Prudential</u> factors within its analysis of the <u>Girsh</u> factors, <u>infra</u>. Since there is much overlap in this case, the Court finds it unnecessary to conduct a separate analysis of the <u>Prudential</u> factors.

LEXIS 25286, at *13 (3d Cir. Sept. 8, 2018) (citing <u>In re Gen.</u>
<u>Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55
F.3d 768, 796 (3d Cir. 1995)).  Here, the Court finds that
presumption warranted.[5]  In addition, as described immediately
<u>infra</u>, the Court finds that the settlement satisfies the
relevant <u>Girsh</u> and <u>Prudential</u> factors.

### a. <u>Complexity, Expense, and Likely Duration of the Litigation</u>

This factor "is intended to capture 'the probable costs, in
both time and money, of continued litigation.'"  <u>In re GMC Pick-</u>
<u>Up Truck Fuel Tank Prods. Liab. Litig.</u>, 55 F.3d at 812 (citing
<u>Bryan v. Pittsburgh Plate Glass Co.</u>, 494 F.2d 799, 801 (3d
Cir.), <u>cert. denied</u>, 419 U.S. 900 (1974)).  Generally, where
bringing a litigation to its conclusion "would be legally and
factually complex and extremely expensive and time-consuming,"
this factor favors settlement.  <u>In re Prudential Ins. Co. of Am.</u>
<u>Sales Practices Litig.</u>, 962 F. Supp. 2d 450, 537 (D.N.J. 1997).

This is a class action concerning claims by 13,895
potential claimants.  To bring this action to judgment via

---

[5] The presumption is doubly warranted considering the fact that
mediation before Magistrate Judge John Hughes (Ret.) and
Magistrate Judge Joel Schneider led to this settlement.  <u>See</u>
<u>Alves v. Main</u>, No. 01-789 (DMC), 2012 U.S. Dist. LEXIS 171773,
at *73-74 (D.N.J. 2012), <u>aff'd</u>, 559 F. App'x 151 (3d Cir. 2014)
("The participation of an independent mediator in settlement
negotiations 'virtually insures that the negotiations were
conducted at arm's length and without collusion between the
parties.'" (internal citation omitted)).

trial, this Court would likely need to consider a class
certification motion, summary judgment motions, and pre-trial
motions.  In addition, more discovery would likely be requested
and multiple appeals would likely be taken.  Trial would likely
be long, complex, and burdensome upon the Court and the parties.
Plaintiffs estimate this process, including trial, would take
another three years.  This, Plaintiffs assert, could lead to
less class members being able to claim a benefit.  For these
reasons, the Court finds this factor weighs in favor of
approving the Settlement Agreement.

> **b. The Reaction of the Class to the Settlement**

The second Girsh factor "'attempts to gauge whether members
of the class support the settlement.'"  In re Warfarin Sodium
Antitrust Litig., 391 F.3d 516, 536 (3d Cir. 2004) (quoting
Prudential, 148 F.3d at 318).  This factor requires the Court to
consider the objections (or lack thereof) of the class members
to the settlement.  When no class members, or only a small
portion, object to the settlement, that fact "strongly favors"
settlement.  Stoetzner v. U.S. Steel Corp., 897 F.2d 115, 118-19
(3d Cir. 1990).  See also Bell Atl. Corp. v. Bolger, 2 F.3d
1304, 1313-14 (3d Cir. 1993) ("This small proportion of
objectors [(30 out of 1.1 million)] does not favor derailing
settlement.")  Here, there has been one objection to the
settlement agreement, which may be fairly characterized as an

objection to the incentive award, not the award to the
individual class members.[6]  This fact "strongly favors" approving
the Settlement Agreement.

### c. **The Stage of the Proceedings and the Amount of Discovery Completed**

The third <u>Girsh</u> factor "captures the degree of case
development that class counsel [had] accomplished prior to
settlement.  Through this lens, courts can determine whether
counsel had an adequate appreciation of the merits of the case
before negotiating."  <u>In re Warfarin Sodium Antitrust Litig.</u>,
391 F.3d at 537 (quotations and citations omitted).

Discovery in this case included:

- Substantial document production to determine the identity
  of putative class members and Defendants' policies and
  practices applicable to this case;

- A walkthrough of the Burlington County Jail; and

- Depositions of Sgt. Williams, C.O. Leinhauser, Warden Artis
  (the Rule 30(b)(6) designee), Captain Schultze, Plaintiff
  Haas, and Plaintiff Szczpaniak.

This discovery took place over the course of approximately one

---

[6] Even if the Court were to lower the incentive award here it
would not be lowered to zero or anything approaching such an
amount.  Class representatives often receive low five-figure
incentive awards in cases of this kind and this case would be no
different. See <u>infra</u> note 14.  Therefore, even if there were a
good reason, which there is not, for the Court to lower the
incentive awards here the net effect on funds available to
claimants would be minor at best, if not <u>de minimis</u>.

year, between November 2012 and September 2013.  As the parties

know, this case has been pending before the Court for nearly a

decade.

This Court finds this factor weighs in favor of approving

the settlement.  This Court finds this case is similar to the

Alves case recently approved in this District.  Alves, 2012 U.S.

Dist. LEXIS 171773, at *60-62.  There, the court found that in

addition to the extensive formal discovery conducted in the

case, "the continual informal exchange of information during the

settlement process" in a case that was "a decade old" also

supported favoring settlement under this factor.  Id.  Although

formal discovery appears to be somewhat less extensive in this

case, it appears to the Court that the similarities between

these cases weighs this factor in favor of approving the

Settlement Agreement.

> **d. The Risks of Establishing Liability and the Risks of Establishing Damages**

The fourth and fifth Girsh factors are usually analyzed

together.  See, e.g., McCoy v. Healthnet, Inc., 569 F. Supp. 2d

448, 461 (D.N.J. 2008).  Thus, the Court will analyze these

factors together here.  Generally, these factors require the

Court to "survey the potential risks and rewards of proceeding

to litigation in order to weigh the likelihood of success

against the benefits of an immediate settlement."  In re

<u>Warfarin Sodium Antitrust Litig.</u>, 391 F.3d at 537 (citation
omitted).

The risks of litigating this case to its conclusion, as in
many of the cases before this Court, are manifest and
multifaceted.  The parties are likely to contest certification,
liability, and whether damages[7] are appropriate.  Liability was
not certain in this case.  Each of these is an issue complicated
in its own right.  As observed by Judge Schneider and this
Court, full litigation of this matter may have required
litigation of a complicated constitutional issue left unresolved
in <u>Florence</u>, the adjudication of which may have required years
of trial and likely appellate litigation including petitions
before the high court.

Even if Plaintiffs were successful on all of these issues,
the parties will still be left to determine which claimants are
properly within the Class.  These are precisely the reasons why
settlement is favored by the parties in the vast majority of
cases before the Court and why it should be favored in this
specific case.  Accordingly, these factors favor approving the
Settlement Agreement.

---

[7] Plaintiffs point out a particular risk in this case pertaining
to damages.  In this case, the damages were dignitary and
intangible, rather than pecuniary and tangible.  Thus, even
ignoring the risks of establishing liability, Plaintiffs would
face yet another barrier in establishing damages.

**e. The Risks of Maintaining the Class Action through the Trial**

The sixth <u>Girsh</u> factor measures the likelihood of obtaining and maintaining a class certification if the action were to proceed to trial because "the prospects for obtaining certification have a great impact on the range of recovery one can expect to reap from the class action." <u>In re Warfarin Sodium Antitrust Litig.</u>, 391 F.3d at 536. A district court may decertify or modify a class at any time during the litigation if it proves to be unmanageable. <u>Id.</u> (citation omitted). For that reason, the Court finds this factor to be neutral.

**f. The Ability of the Defendants to Withstand a Greater Judgment**

The seventh <u>Girsh</u> factor considers "whether the defendants could withstand a judgment for an amount significantly greater than the settlement." <u>Id.</u> at 537-38 (quotations and citation omitted). Even if a party "could afford to pay more [that] does not mean that it is obligated to pay any more than what the [] class members are entitled to under the theories of liability that existed at the time the settlement was reached." <u>Id.</u> at 538.

Plaintiffs here explain that Defendants are likely unable to sustain a larger judgment. In this case, a significant dispute erupted between Defendants and their insurance carrier. This, according to Plaintiffs, imposed the risk of a complete

denial of coverage, which would have left the burden of this
judgment solely on Defendants, a public entity with limited
coffers.  The Court finds this factor also favors approving the
Settlement Agreement.[8]

>    **g. The Range of Reasonableness of the Settlement Fund in
>    Light of the Best Possible Recovery and in Light of
>    All the Attendant Risks of Litigation**

The final two Girsh factors collectively "evaluate whether
the settlement represents a good value for a weak case or a poor
value for a strong case."  In re Warfarin Sodium Antitrust
Litig., 391 F.3d at 538.  These factors "test two sides of the
same coin: reasonableness in light of the best possible recovery
and reasonableness in light of the risks the parties would face
if the case went to trial."  Id. (citing Prudential, 148 F.3d at
322).  "'[T]he present value of the damages plaintiffs would
likely recover if successful, appropriately discounted for the
risk of not prevailing, should be compared with the amount of
the proposed settlement.'"  Id. (quoting Prudential, 148 F.3d at
322.)

It is difficult to ascertain what the best possible

---

[8] It could be said that, technically, Defendants could withstand
a greater judgment.  Defendants rely upon the taxpayers to fund
their operations, including when those operations resulting in
legal liability.  But, as the court pointed out in Alves, "it is
more preferable to have a settlement that Defendants consider a
funding priority, as opposed to the potential for an unfunded
judicial mandate following a trial and appeals years from now."
2012 U.S. Dist. LEXIS 171773, at *69-70.  This also supports
approving the Settlement Agreement here.

recovery would be in this factual scenario, especially for an
individual plaintiff outside of the class context.  Cases
concerning this particular type of constitutional or statutory
harm are usually tried in the class context.  It appears that
this would be a reasonable settlement in light of the best
possible recovery and is certainly within the range of
recoveries in other, similar class actions.  (See Pls.' Br. for
Final Approval 13-14 (discussing other cases in this District
with similar facts where settlements ranging between $200-$1,000
per claimant were approved).)

Considering the relatively old age of the case and the
dispute between Defendants and their insurer, it appears
Plaintiffs are correct in asserting this is reasonable in light
of the best possible recovery and the attendant litigation
risks.  Thus, this Court finds these two factors weigh in favor
of approving the settlement.

The analysis of the Girsh factors confirms that the
proposed settlement is fair, reasonable, and adequate.  The
Court therefore approves the Settlement Agreement.  See FED. R.
CIV. P. 23(e) ("The claims, issues, or defenses of a certified
class may be settled, voluntarily dismissed, or compromised only
with the court's approval . . . .  If the proposal would bind
class members, the court may approve it only after a hearing and
on finding that it is fair, reasonable, and adequate.").

### C. Motion for Approval of Attorneys' Fees, Incentive Awards, and Administrative Fee

Under Rule 23(h), "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." A claim for an award must be made by motion,[9] and it must be served on all parties and directed to class members in a reasonable manner. FED. R. CIV. P. 23(h). Class counsel has moved for Court approval of their attorneys' fees ($925,000 inclusive of expenses), incentive awards ($50,000 for Plaintiff Haas and $30,000 for Plaintiff Szczpaniak), and administrative fee (a maximum of $300,000 for the class administrator, SCS).

#### a. Attorneys' Fees

"[A] thorough judicial review of fee applications is required in all class action settlements." In re Warfarin Sodium Antitrust Litig., 391 F.3d at 536 (quotations and citations omitted). Even under this thorough review, "[c]ounsel for a class action is entitled to reimbursement of expenses that were adequately documented and reasonably and appropriately incurred in the prosecution of the class action." Careccio v.

---

[9] The motion for attorneys' fees must be filed pursuant to Rule 54(d)(2), which requires it to be: (i) filed within 14 days of the entry of judgment; (ii) specify the grounds entitling the movant to the award; (iii) state the amount sought; and (iv) disclose, if the court so orders, the terms of any agreement about fees for which the claim is made. FED. R. CIV. P. 54(d)(2). Class counsel has met all of these requirements.

BMW of N. Am. LLC, No. 08-2619, 2010 U.S. Dist. LEXIS 42063, at *22 (D.N.J. Apr. 29, 2010).

Since this case was settled under New Jersey law and is subject to a New Jersey fee-shifting statute, attorney's fees must be calculated using the New Jersey lodestar method articulated by the New Jersey Supreme Court in Rendine v. Pantzer, 661 A.2d 1202 (N.J. 1995). See Lanni v. New Jersey, 259 F.3d 146 (3d Cir. 2001). Under the Rendine method, the Court first engages in a standard, federal lodestar formula and then may also determine and apply a multiplier. Rendine, 661 A.2d at 1225.

The lodestar method requires the Court to calculate "the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." Id. (internal quotation marks omitted). The first step is to determine the appropriate hourly rate. This is determined by considering the attorneys' hourly billing rate "given the geographical area, the nature of the services provided, and the experience of the lawyer." Gunter v. Ridgewood Energy Corp., 223 F.3d 190, 195 n.1 (3d Cir. 2000). Next, a court must determine whether the hours noted were reasonably expended. In doing so, a court "should review the time charged, decide whether the hours set out were reasonably expended for each of the particular purposes described and then exclude those that are 'excessive, redundant, or otherwise

unnecessary.'" Pub. Interest Research Grp. v. Windall, 51 F.3d 1179, 1188 (3d Cir. 1995) (citation omitted).

Counsel has indicated that their usual billing rates were used for this case. This Court determines, because counsel charged at their standard billing rate, that the billing rates are reasonable. In aggregate, counsel claims to have billed 3,831 hours.[10] The Court finds that the amount of hours billed in this case was reasonable, considering the litigation involved complicated legal issues of constitutional stature and federalism, extensive discovery, mediation, and settlement discussions, and ten years over which the attorneys were required to expend time to bring this case to its conclusion. The raw lodestar for this amount is $2,278,197.50.

The Court finds the agreed to fees of $900,000 are reasonable in light of the raw lodestar amount. First, the fees agreed to are less than 40% of the raw lodestar. A negative lodestar suggests the fees requested are reasonable, even in light of the potential for manipulation of the lodestar. Second, this Court notes that "the absence of substantial objections by class members to the fee requests weigh[s] in

---

[10] The Court notes here that there is a dispute between counsel as to the reasonableness of rates and whether some of the hours expended in the litigation were reasonable. These issues, however, will not be addressed here as that dispute relates to how counsel will split the fees, not the reasonableness of the overall amount of fees.

favor of approving the fee request." <u>In re Rite Aid Corp. Sec.</u>
<u>Litig.</u>, 396 F.3d 294, 305 (3d Cir. 2005). There have been no
objections to the fee request. Third, counsel have represented
here that the amount of attorneys' fees was negotiated as a
separate aspect of the settlement agreement, which further
supports reasonableness.

Finally, a cross-check of the lodestar method with the
percentage-of-recovery ("POR") method[11] shows the counsel fees in
this case are reasonable. Here, the POR method reveals that the
requested fee award is about 60% of the settlement fund set
aside for individual class members and class representatives.
While typical POR fee awards range between 25%-45%, this case
concerns a dignitary harm that is not easily reduced to damages.
Moreover, not encapsulated in the damages award is the
significant relief caused by this case which benefits both class
members and the public at-large: BCCF changed their strip search
policy. Because these types of relief would tend to
underrepresent the true value of the attorneys' work as related
to the award, the POR cross-check reveals, upon further
investigation, a reasonable fee award. This correlates with the
Court's finding under the lodestar method.

---

[11] The Court notes that POR method requires a court to consider
seven factors in assessing the reasonableness of the fee. <u>In re</u>
<u>Ins. Brokerage Antitrust Litig.</u>, 579 F.3d 241, 279 (3d Cir.
2009) (discussing <u>Gunter</u>). The <u>Gunter</u> factors are not applicable
to the lodestar method. <u>See</u> <u>id.</u>

Accordingly, this Court finds the attorneys' fees requested in the settlement agreement are reasonable and approves the amount requested, in the aggregate. This Court also approves as reasonable the additional $25,000 set aside to cover out-of-pocket costs paid for by Plaintiffs' counsel throughout the decade of this litigation. This Court reserves decision on the amount of fees each counsel will receive. This Court will not – at this juncture – determine the merits of class counsel's disputes nor determine whether a <u>Rendine</u> multiplier is appropriate for this case, and if so, determine its amount. This Court will refer the issue of the split of attorneys' fees to Magistrate Judge Schneider pursuant to Federal Rule of Civil Procedure 23(h)(4).

### b. <u>Incentive Awards</u>

Since this case has been resolved pursuant to state law claims, this Court must look to New Jersey law to determine whether the incentive awards for the class representatives are appropriate in this case. Whether to grant an incentive award is "entirely within the trial court's discretion." <u>Machulsky v. Lilliston Ford, Inc.</u>, No. A-2987-06T5, 2008 N.J. Super. Unpub. LEXIS 2603, at *8 (N.J. Super. Ct. App. Div. July 21, 2008). New Jersey has identified two possible factor tests that may be used to test the reasonableness of such awards. <u>Id.</u> at *8-9. In its discretion, this Court finds the five-factor test cited

in Machulsky to be a better probe of the class representatives'
service in this case, but finds that the incentive awards would
be reasonable under either test cited therein.  The Court must
determine these five factors:

> 1) the risk to the class representative in commencing
> suit, both financial and otherwise;
>
> 2) the notoriety and personal difficulties encountered
> by the class representative;
>
> 3) the amount of time and effort spent by the class
> representative;
>
> 4) the duration of the litigation; and
>
> 5) the personal benefit (or lack thereof) enjoyed by
> the class representative as a result of the
> litigation.

Id. at *8.

Both Plaintiff Haas's and Szczpaniak's role in this case
show that the first factor weighs in favor of their respective
incentive awards.  Their willingness to act as class
representatives required them to make public the fact that they
were arrested (and the reasons for their arrest), strip
searched, and detained.  For Plaintiff Haas, this resulted in
various personal assaults during the pendency of the litigation,
and may have resulted in the same for Plaintiff Szczpaniak, as
well as complications concerning the employment of Haas's
immediate family member.[12]  While these risks were not financial,

---

[12] The Court notes that Plaintiff Haas was subject to lewd

they are no less substantial or seriously felt.  Without an incentive award, putative class representatives may be discouraged to come forward in cases involving alleged violations of constitutional rights that open them to public judgment of private facts.  Plaintiff Haas also agreed to release any and all claims she may have had for an allegedly retaliatory strip search which occurred well after the strip search at issue in this case.[13]  For the same reasons discussed here, the second factor also weighs in favor of the incentive award.

This litigation has spanned a decade, and Plaintiff Haas has been there from the start.  Plaintiff Szczpaniak joined the litigation a year later, spending approximately nine years as a class representative.  Their role required responding to discovery requests, being deposed, appearing in court, and participating in settlement discussions.  Over a decade-long period, this amounts to a significant outlay of time and effort.  The third factor weighs in favor of an incentive award.  For the

_____

comments because her husband, William Layton, was a correctional officer at BCCF.  According to Plaintiff Haas, Layton was terminated because of this suit brought by his wife.  Plaintiff Haas was also subject to lewd comments by a former counsel involved in this case.

[13] This is an additional financial reason why Plaintiff Haas's incentive award is reasonable, as she not only represented the class, but is releasing a separate claim against Defendants.

same reasons, the fourth factor also weighs in favor of an incentive award.

Finally, the Court considers the fifth factor. Plaintiffs Haas and Szczpaniak did not stand to personally benefit for their service as class representatives as a result of this litigation, absent the agreed to incentive awards. It is unlikely that either would be subject to a strip search again at BCCF (even though that unlikely event did allegedly occur to Plaintiff Haas). Therefore, a $400 award would be a rather small sum to compensate their service, which achieved the greater purpose of compensating the class and effectuating a meaningful change in policy at BCCF with a substantial public benefit. Thus, this factor favors an incentive award.

The Court must also note that one individual objected to the incentive award for Plaintiff Haas. Essentially, the individual stated he thought the amount was too high. Considering the facts discussed <u>supra</u>, that this was the only objection, and that the individual objecting was incorrect in his or her calculations, this Court finds this objection unpersuasive.[14] The Court also notes, based on the amount of

---

[14] Additionally, this Court finds as a general matter that incentive awards of this size are reasonable. Cases from this District have approved of incentive awards of both $50,000 and $30,000. <u>See</u>, <u>Desantis v. Snap-On Tools Co., LLC</u>, No. 06-2231 (DMC), 2006 U.S. Dist. LEXIS 78362, at *9-10, 36 (D.N.J. Oct. 27, 2006) (approving $50,000 class representative incentive

class members who have filed claims to this date, that even though the incentive awards do draw from the general settlement fund, they do not reduce the award available to the other class members.[15]  Accordingly, this Court finds reasonable the incentive awards and approves them.

### c. **Administrative Fee**

This Court also examines the administrative fee that the Settlement Agreement contemplates for the claims administrator, SCS.  Under the terms of the Settlement Agreement, SCS may be paid up to $300,000 for its services in providing notice to the class and processing claims, from receipt through payment. There is no special test for determining whether or not this amount of money is fair and reasonable.

This Court notes, however, various facts which support its decision to approve of the amount of fees paid to SCS.  First,

---

award); In re Remeron Direct Purchaser Antitrust Litig., No. 03-0085 (FSH), 2005 U.S. Dist. LEXIS 27013, at *50-52 (D.N.J. Nov. 9, 2005) (approving $30,000 class representative incentive award and discussing District case law concerning incentive awards approved in similar amounts).

[15] If judged under federal law, this fact would support approval of these incentive awards.  See Henderson v. Volvo Cars of N. Am., LLC, 2013 U.S. Dist. LEXIS 46291, at *56-57 (D.N.J. Mar. 22, 2013) (citing Dewey v. Volkswagen of Am., 728 F. Supp. 2d 546, 577 (D.N.J. 2010)) (other citations omitted) (approving a total of $33,000 in incentive awards, and noting that "courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation," particularly when the incentive awards will not reduce the recovery to any class member).

the Court notes that there has been no objection by any Class Member to the Settlement Agreement's provision granting $300,000 to SCS. Second, this Court notes that this payment is not taken from the settlement fund, but from a separate amount. The payment to SCS, therefore, will have no effect on the amounts available to class members. Third, the amount does not strike this Court as unreasonable. SCS was tasked with providing notice through various means, creating and maintaining a website, fielding calls and correspondence from putative class members, and receiving and organizing claims. This is no small task for a class containing almost 14,000 individuals.

Accordingly, this Court approves payment of up to $300,000 – as contemplated by the Settlement Agreement – to SCS to compensate it for the work it has done on behalf of the Class and counsel.

### D. Late Claims

Finally, in a letter filed with this Court on January 11, 2019, Plaintiffs' counsel requested this Court to preemptively consider whether it would accept untimely claims. The late claims this Court must consider are those first filed with SCS after the October 15, 2018 deadline.[16] At the hearing considering final approval of the Settlement Agreement, the

---

[16] As noted <u>supra</u>, there were approximately 431 late claims filed between October 15, 2018 and January 16, 2019.

parties discussed further arguments on the record concerning late claimants.

The Court now finds that the Settlement Agreement, executed by all parties, requires SCS to accept all claims up to and including January 16, 2019 – the date of the final fairness hearing. The settlement agreement requires the parties to request the Court consider these untimely claims and include them in the class. Thus, the following decision concerning late claimants applies to all claims received by SCS as of 5 PM on Wednesday, January 16, 2019.

Plaintiffs assert that this Court must consider the Pioneer factors when deciding whether to include untimely claims in the class. Those factors include: "1) the danger of prejudice to the nonmovant; 2) the length of the delay and its potential effect on judicial proceedings; 3) the reason for the delay, including whether it was within the reasonable control of the movant; and 4) whether the movant acted in good faith." In re Orthopedic Bone Screw Prods. Liab. Litig.,246 F.3d 315, 322-23 (3d Cir. 2001) (citing Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)). The Court will consider each factor in turn.

First, the danger of prejudice to the Defendants. The Court finds here there is no prejudice to Defendants. Defendants, after arms-length negotiations, agreed to accept

claims up until the date of the final fairness hearing, which
was January 16, 2019.  The parties agreed that they would
petition the Court to allow these late claimants into the Class.
Since Defendants agreed to this procedure, the Court does not
find any prejudice will result.

Second, the Court must consider the length of the delay and
its potential effects on the judicial proceedings.  The delay
was – at most – three months, which equals the time between the
October 15 deadline and the final fairness hearing.  In a case
that has spanned nearly eleven years, this is rather
insubstantial.  Moreover, it has no effect on the judicial
proceedings.  Besides occupying some argument time at the final
fairness hearing and the time to form this Opinion, it did not
delay the Court's final opinion in this matter nor does it delay
payment of settlement monies to timely claimants.

Third, the Court must consider the reason for the delay.
It appears the reason for the delay here is inherent in the
unique nature of the class.  The amount of time that had elapsed
between a strip search and settlement ranged between a decade or
more and five years.  Records which may have been accurate at
the time of their strip search at the BCCF may be inaccurate
now.  Thus, individuals were difficult to locate and provide
notice to.  While this Court still finds that constitutionally
adequate notice was provided to the Class, there is reason to

believe that the late claimants did not receive actual notice until direct emails were sent after the original claims period had closed.  Late claimants should not be punished because SCS failed to send emails before the class period closed.  This Court finds this factor favors inclusion of the late claimants.

Fourth, the Court must consider whether the late claimants acted in good faith.  This Court finds the late claimants acted in good faith.  The late claimants likely submitted claims after receiving an email from SCS advising them that, although their claim was late, it would still be brought before the Court for approval.  This appears to show that late claimants submitted their claim with the good faith belief – created through the email – that untimely claims could still be made.  Thus, this Court finds this factor also weighs in favor of inclusion of the late claimants.

Additionally, the Court notes two other facts motivating its decision here.  First is the fact that the parties agreed to this process in advance of notice being provided.  Therefore, there is no prejudice to Defendants – as articulated supra – but there was also an expectation created in the class members.  As long as the claim was received on the date of the final fairness hearing, their counsel had a legal obligation to argue for their inclusion.  Second is the fact that Defendants still stand to receive a substantial reverter.  While that reverter has

decreased because of the inclusion of late claimants, Defendants are still able to retain some funds originally pledged to Class Members.  Finally, those claimants who filed timely claims will not be harmed because allowance of the late-filed claims does not diminish their award under the settlement.

Accordingly, this Court finds – within its equitable discretion – that all claimants who have filed claims by 5 PM on January 16, 2019 will be entitled to a share of the settlement fund as outline in the Settlement Agreement.

## CONCLUSION

For the reasons stated herein, this Court will grant the Motion for Final Settlement Approval and the Motion for Haas Incentive Award Approval.  The Court will refer the Motion for Poplar and Riback Fee Approval and the Motion for Lask, Goldman, and Novack Fee Approval to Magistrate Judge Schneider for further resolution.

An appropriate Order will be entered.


Date:  January 31, 2019              s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.